1

2

3

4

5

6

7

8        UNITED STATES DISTRICT COURT

9        NORTHERN DISTRICT OF CALIFORNIA

10        SAN JOSE DIVISION

11

12   ARTHUR CHESTER MEFFORD,              )        No. C 00-20328 JW (PR)
                                          )
13                Petitioner,             )        ORDER DENYING PETITION FOR A
                                          )        WRIT OF HABEAS CORPUS
14      vs.                               )
                                          )
15   ERNEST ROE, JR, Warden,              )
     California State Prison, Lancaster   )
16                Respondent.             )
                                          )
17   _____

18          Petitioner, a state prisoner, filed a pro se petition for writ of habeas corpus pursuant to 28

19   U.S.C. § 2254.  His application to proceed in forma pauperis was granted in an earlier order.

20   This Court found that the petition, liberally construed, stated cognizable claims under § 2254 on

21   the claims of ineffective assistance of trial (claims 3 and 9) and appellate counsel (claim 13); due

22   process violation (claims 4 and 6); insufficient evidence to support conviction for possession of

23   methamphetamine (claim 8); cruel and unusual punishment (claim 11); and a claim that use of

24   1977 conviction pursuant to plea as an enhancement violated plea agreement (claim 12.).  The

25   Court dismissed claims for: violation of rights under People v. Wheeler, 22 Cal.3d 258 (1978)

26   (claim 1); violation of the Fourth Amendment (claim 2), ex post facto use of convictions that

27   occurred prior to the passage of the three strikes law (claim 10).  (Order 6/12/2000, Docket # 6.)

28   By Order dated March 2, 2001, the Court found that claims 5, ineffective assistance of counsel

for failure to challenge the prosecutorial misconduct, and Claim 7, ineffective assistance of counsel for failure to preserve the error as to restrictions on impeachment, were not exhausted. (Docket #34.) On March 16, 2000, Petitioner elected to dismiss unexhausted claims 5 and 7. Petitioner obtained a stay of these proceedings in order to exhaust claims 5 and 7. Respondent was Ordered to show cause why a Writ of Habeas Corpus should not be granted as to the remaining claims. (Docket # 36.) Respondent filed an Answer (Docket # 51) and Petitioner filed a Traverse. (Docket # 69.) After the claims were exhausted, the Court lifted the stay and ordered Respondent to show cause why a writ of habeas corpus should not be granted as to those claims. (Docket # 86.) Respondent has filed an answer, and petitioner has filed a traverse.

I.    **BACKGROUND**

A.    <u>Procedural History</u>

On March 6, 1996, in the Superior Court of the State of California in and for the County of Marin petitioner was found guilty of possession of a firearm by a felon, Cal. Penal Code §12021(a)[1] and possession of a controlled substance (methamphetamine), Cal. Health & Safety Code § 11377. (Docket # 29, Exh. A to Motion to Dismiss, Register of Actions in <u>People v. Arthur Chester Mefford,</u> Action No. SC07400A., hereinafter "Exh. A.").[2] Following trial on the prior conviction allegations, the court sustained: four prior "strike" and "serious felony" enhancements, §§667(a), 1170.12(a), 1192.7(c); four "prior prison" enhancements, § 667.5((b); and found that Petitioner was presumptively ineligible for probation because he had incurred twelve prior felony convictions, §1203(e)(4). (Exh. A 21-22, Exh. C, California Appellate Court Opinion, (hereinafter "Opinion."). The trial court sentenced Petitioner to a determinate term of four years for the "prison priors" and, pursuant to California's "Three Strikes Laws," §§667(b)-(I), 1170.12, 1192.7(c), imposed consecutive indeterminate terms of twenty-five-years-to-life for each felony count. (Exh. A at 24-25.) Petitioner's aggregate term was fifty-four-

---

[1]All further statutory references are to the California Penal Code, unless otherwise noted.

[2]All further references to exhibits are to Docket # 29, unless otherwise noted.

1  years-to-life. (Exh. A at 25.)

2      On September 25, 1997, the California Court of Appeal affirmed the Judgment and

3  review was denied by the California Supreme Court on January 14, 1998. (Order, Exh. D).

4  Petitioner filed state habeas petitions in the Superior Court for the State of California, the

5  California Court of Appeals, and the California Supreme Court.  The state high court denied the

6  petition on January 25, 2000. (Exh. H.) Petitioner filed the instant federal habeas petition on

7  March 10, 2000.

8      B.      Statement of Facts

9      On Friday, March 17, 1995, then California Highway Patrol (CHP) Office Klugman

10  stopped a car driven by Petitioner, a felon, for having an expired license plate, no front license

11  plate, no right side mirror, and improper rear window tinting.  (Exh. C, Opinion at 1-2).

12  Petitioner produced an expired temporary driver's license in the name of Corey Shannon and

13  indicated that he was Shannon.  Id. at 2.  The CHP dispatcher advised Klugman that Shannon's

14  license was suspended and Klugman noted that Petitioner's appearance was inconsistent with the

15  physical description on the temporary license.  Id.  Petitioner admitted his true name and gave

16  Klugman a Department of Motor Vehicles printout for the car.  Because Klugman was unsure of

17  Petitioner's identity, he booked the Petitioner into the county jail and had the car towed and

18  impounded.  Id.

19      Later that day, Petitioner and a friend, Gia Vescera ("Vescera"), went to the towing yard

20  to get the vehicle.  The towing yard office manager, Mr. Mendelson, told Petitioner that he

21  would need a CHP release form and he would have to pay tow and storage fees.  Id.  On

22  Monday, March 20, Petitioner and Vescera returned to the towing yard.  Petitioner told

23  Mendelson that he did not have the $200 in accrued fees and asked if he could use his brother's

24  shotgun as collateral.  Id.  Mendelson received permission from the tow yard owner, Mr. Cotton,

25  and Petitioner handed over the shotgun.  Id.  When Mendelson observed what he thought were

26  alterations on the CHP release form, he called the CHP office.  Officer Sims advised him to

27  retain custody of the shotgun and have Petitioner return to the CHP office for a proper release.

28  Id.  When Mendelson refused to return the shotgun, Petitioner indicated that he had a Mack 10

1  (an automatic handgun) or a Glock (a brand of semiautomatic handgun) outside of the towing
2  yard.  Id.

3       When Petitioner returned to the CHP office, Klugman arrested him.  Id.  Deputy Sheriff
4  Wilbanks strip-searched Petitioner and, when Petitioner bent over, Wilbanks noticed a plastic
5  baggie protruding from Petitioner's anus.  Id.  When asked to remove the baggie, Petitioner said
6  he had nothing.  Wilbanks then placed Petitioner in a camera-monitored safety cell.  Id.

7       After approximately 15 minutes, Petitioner several times reached toward his crotch and
8  then brought his hand up to his face.  Opinion at 2-3.  Petitioner then "scooted" over to the cell's
9  waste hole, brought his hands to his crotch area and appeared to drop something in the hole.
10  Opinion at 3.  Deputies Wilbanks and Fode and Sheriff's Sergeant Augustus entered the safety
11  cell and noticed a very small amount of white powder on Petitioner's chest and chin.  Opinion at
12  3.  Petitioner denied putting anything in the waste hole.  Id.  "A plastic baggie coated with a
13  white powdery substance was found in the waste hole drain, and a 'little more' of the same kind
14  of white powder found on [Petitioner's] chest was found in the corner of the cell.  Augustus put
15  both the substance collected from [Petitioner's] chest and that found in the cell in the same paper
16  bindle."  Id.

17       Deputies moved Petitioner to a "detox cell" and by 5:30 p.m., Petitioner was sweating
18  profusely, shook fairly severely, and his pupils were dilated.  Id.  Augustus told responding
19  paramedic that Petitioner was under the influence of a stimulant, either methamphetamine or
20  cocaine.  Id.  Agustus testified that Petitioner's symptoms appeared consistent with a
21  methamphetamine or other stimulant overdose and that, in his opinion, the amount of white
22  substance collected was a usable amount.  Id.  Emergency room doctor Seth Pecker opined that
23  Petitioner's symptoms were consistent with a  methamphetamine overdose but were other
24  consistent with other types of stimulant overdose.  Id.  Dr. Peckler had been informed that a
25  baggie had popped in Petitioner's rectum and the substance had been tested, but Dr. Pecker had
26  already concluded that Petitioner was under the influence of an overdose of stimulant.  Opinion
27  at 3-4.

28       Internist Lennon examined Petitioner an hour after his arrival in the emergency room.

Opinion at 4.  Based on his own observations, his review of Petitioner's chart, and his discussions with Dr. Peckler, Dr. Lennon believed Petitioner had suffered an inadvertent methamphetamine overdose.  Opinion at 4.  When Dr. Lennon confronted Petitioner with information that a baggie of "speed" had burst in his rectum, Petitioner did not offer a denial.  Id.

No urine drug screen was performed prior to Petitioner being admitted to the hospital and, consistent with  methamphetamine use, Petitioner did not produce any urine for over 12 hours.  Id.  The following day, Petitioner refused to consent to drug testing.  Id.  The state criminologist testified that amount Petitioner possessed prior to the deputies' observance of the baggie sticking of Petitioner's anus was a "usable" amount.  A presumptive color test indicated the possible presence of  methamphetamine with no indication of cocaine and gas chromatograph mass spectrophotometer testing was positive for  methamphetamine.  Id.; see also Exh. F5 at 12-21; RB (respondent's brief) at 4-13; RT 1008.  The criminologist opined that anything less than .01 gram was not a useable quantity, defined as "an amount that can be manipulated and ingested and consumed in a fashion typical for that drug."  Id.  Although the white powered recovered from Petitioner weighed less than .01 gram, the criminologist testified that assuming that a person suffered from a  methamphetamine overdose about an hour after the  methamphetamine found was tested would cause him to opine that the person had possessed usable quantity.

**II.    DISCUSSION**

A.    Standard of Review

This court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).

The writ may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  Id. § 2254(d).

1    "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state
2    court arrives at a conclusion opposite to that reached by [the Supreme]  Court on a question of
3    law or if the state court decides a case differently than [the] Court has on a set of materially
4    indistinguishable facts." <u>Williams v. Taylor</u>, 529 U.S. 362, 412-13 (2000).  "Under the
5    'unreasonable application clause,' a federal habeas court may grant the writ if the state court
6    identifies the correct governing legal principle from [the] Court's decisions but unreasonably
7    applies that principle to the facts of the prisoner's case." <u>Id.</u> at 413.

8     "[A] federal habeas court may not issue the writ simply because the court concludes in
9    its independent judgment that the relevant state-court decision applied clearly established federal
10   law erroneously or incorrectly.  Rather, that application must also be unreasonable." <u>Id.</u> at 411.
11   A federal habeas court making the "unreasonable application" inquiry should ask whether the
12   state court's application of clearly established federal law was "objectively unreasonable."  <u>Id.</u> at
13   409.

14   A federal habeas court may grant the writ it if concludes that the state court's
15   adjudication of the claim "resulted in a decision that was based on an unreasonable
16   determination of the facts in light of the evidence presented in the State court proceeding." 28
17   U.S.C. § 2254(d)(2).  The court must presume correct any determination of a factual issue made
18   by a state court unless the petitioner rebuts the presumption of correctness by clear and
19   convincing evidence. 28 U.S.C. §2254(e)(1).

20   The only definitive source of clearly established federal law under 28 U.S.C. § 2254(d) is
21   in the holdings (as opposed to the dicta) of the Supreme Court as of the time of the state court
22   decision. <u>Williams</u>, 529 U.S. at 412; <u>Clark v. Murphy</u>, 331 F.3d 1062, 1069 (9th Cir. 2003).
23   While circuit law may be "persuasive authority" for purposes of determining whether a state
24   court decision is an unreasonable application of Supreme Court precedent, only the Supreme
25   Court's holdings are binding on the state courts and only those holdings need be "reasonably"
26   applied.  <u>Id.</u>

27   Where the state court summarily denies a claim without a reasoned opinion, the Ninth
28   Circuit has held that the federal habeas court does not conduct a <u>de novo</u> review, but does

1  independently review the denial to determined if the state court clearly erred in order to

2  determine whether the decision was objectively unreasonable.  Delgado v. Lewis, 223 F.3d 976,

3  982 (9th Cir. 2000).  Where the Petitioner has pursued the claim through the state court hierarchy,

4  the federal court "looks through" the state supreme court's silent denial to the last reasoned

5  opinion of the state court.  Ylst v. Nunnemaker, 501 U.S. 797, 803-04 (1991).

6     B.     Claims and Analysis

7           1.     Ineffective Assistance by Trial Counsel (Claims 3)

8           Petitioner claims that trial counsel provided ineffective assistance by failing to move to

9  suppress the shotgun given as collateral for tow and storage fees.  Petition at 5, Memorandum of

10  Points and Authorities in support ("MPA") at 8.  Petitioner further argues that counsel should

11  have sought to exclude not only the shotgun, but also the testimony of Officer Sims and the tow

12  yard employees Mendelson and Heauser, as "fruit of the poisonous tree."  MPA at 10-11.

13  Petitioner argues that without such evidence, the charge of being a felon in possession would

14  have been dismissed.

15           a.     Legal Standard

16           In order to prevail on a Sixth Amendment ineffectiveness of counsel claim, petitioner

17  must establish two things.  First, he must establish that trial counsel's performance was deficient,

18  i.e., that it fell below an "objective standard of reasonableness" under prevailing professional

19  norms.  Strickland v. Washington, 466 U.S. at 687-88 (1984).  Second, he must establish that he

20  was prejudiced by counsel's deficient performance, i.e., that "there is a reasonable probability

21  that, but for counsel's unprofessional errors, the result of the proceeding would have been

22  different."  Id. at 694.

23           "For respondent to succeed, however, he must do more than show that he would have

24  satisfied Strickland's test if his claim were being analyzed in the first instance, because under §

25  2254(d)(1), it is not enough to convince a federal habeas court that, in its independent judgment,

26  the state-court decision applied Strickland incorrectly.  See Williams, supra, at 411, 65 S.Ct. 363.

27  Rather, he must show that the [State Court] applied Strickland to the facts of his case in an

28  objectively unreasonable manner."  Bell v. Cone, 535 U.S. 685, 698-99 (2002).

1

b.      State Court Proceedings

2      Petitioner did not raise this issue on direct appeal, he only asserted general allegations of

3 ineffective assistance of counsel.  The trial judge denied the petition finding that the "unspecific

4 and conclusory" allegations of ineffective assistance of counsel were insufficient to show a

5 violation of Petitioner's rights.  The trial court also found it was clear from the record that

6 Petitioner's claim of ineffective assistance of counsel was "devoid of any basis in fact."  Exh. E

7 at Order at 1.

8      Petitioner raised this claim in his amended second Superior Court habeas petition.  Exh.

9 F. at 3-5 (Ground 1), 7-8. The second petition was reviewed by a judge other than the trial judge.

10 The judge found that a motion to suppress the shotgun would not have been successful because

11 the shotgun had been observed in the Petitioner's possession by the witnesses who worked at the

12 tow yard prior to the shotgun being turned over the California Highway Patrol.  Exh. F7 at 1-2.

13 The judge indicated that he had reviewed the transcript of the trial proceedings in reaching this

14 conclusion.  Id.  Petitioner raised this claim in his habeas petitions before the California Court of

15 Appeal and the Supreme Court.  Ehx G. at 11; Exh H at 2, 10.  Both courts summarily denied the

16 petition without opinion.  (Exhs G and H at Orders.)

17

c.      Elements of Possession of a Firearm by Felon

18      Under California law, "Any person who has been convicted of a felony . . . and who

19 owns, purchases, receives, or has in his or her possession or under his or her custody or control

20 any firearm is guilty of a felony." 12021(a)(1).  No specific intent is required; general intent to

21 commit the proscribed act is sufficient.  People v. Jeffers, 41 Cal. App.4th 917, 922 (1996).

22 "An individual may be in actual or constructive possession of contraband.  Constructive

23 possession does not require direct physical control over an item 'but does require that a person

24 knowingly exercise control or right to control a thing, either directly or through another person

25 or persons.'" People v. Howard, 33 Cal. App.4th 1407, 1419 (1995)(footnote and citation

26 omitted) (controlled substances): see also People v. Spirlin, 81 Cal. App.4th 119, 1 30

27 (2000)(Possession of weapon by felon); People v. Land, 30 Cal. App.4th 220, 223-224

28 (1994)(receiving stolen property).

d.      Record Facts Relevant to Suppression Motion

Any suppression motion had to be filed prior to trial unless the opportunity to make the motion was not available before trial. §1538.5 (f), (h).  Trial counsel represented Petitioner at the preliminary haring.  Mendelson and Officer Klugman testified.  CT24, 28-29, 151.

Mendelson testified that Petitioner and Vescera returned to the tow yard on March 20, 1995. CT 33, 70; RT 523.[3]  Petitioner asked to leave a Browning 12-gauge shotgun as collateral because he did not have the money to pay the tow and storage fees.  CT34, 68; RT 526-527. Medelson received permission from owner Cotton and then told Petitioner that the shotgun would be accepted.  CT 34-35, 37; RT 526-27, 733.  Petitioner returned alone with the shotgun in a case.  CT 35, 70, 77; RT 528-29, 559, 573.  Petitioner presented paperwork that did not satisfy Mendelson.  CT 33, 37, 61-64.   Mendelson advised Petitioner he could not release the care until the paperwork was right.  CT 80.  Petitioner at that point became "highly agitated and aggressive, belligerent, semi-combative and threatening."  CT 37; see also CT 51.

Mendelson telephoned CHP Officer Sims regarding the release and advised him that Petitioner had stated he possess an Ingram rifle and a Mac 10 or 11.  CT 51; RT 534.  Sims told Mendelson to keep the shotgun and to send Petitioner back to the CHP office for a proper release. CT 82.   Petitioner returned to the CHP office and Officer Klugman arrested Petitioner upon prior instruction from petitioner's parole officer.  CT 177; see also RT 360-361.

At trial, Heauser testified that Petitioner returned to the tow yard alone, with the shotgun. RT 483-88; 495-96.  Heauser stated that Mendleson asked him to step into the office where he saw Petitioner holding the shotgun.  RT 496-97.  Heauser stated that he asked Petitioner if he could see the gun, took the gun from Petitioner to check if the weapon  was loaded and that Petitioner did not handle the shotgun after that.  RT 497, 517

e.      Analysis

A Fourth Amendment claim may be raised in a federal habeas petition in the context of a

---

[3]  RT refers to the Report's Transcripts, lodged as Exhibit K to the Answer to the Order to Show Cause; CT refers to the Clerk's Transcript, lodged as Exhibit J. RB refers to Respondent's Brief, lodged as Exhibit I.

1   claim for ineffective assistance of counsel.  Kimmelman v. Morrison, 477 U.S. 365, 375-83

2   (1986).  In order to prevail on a suppression motion, a defendant must show: that he "exhibited

3   an actual, subjective expectation of privacy, and second, whether that expectation is one society

4   is prepared to recognize as reasonable."  People v. Medina, 189 Cal.App.3d 39, 44-45 (5th

5   District, 1989).

6          In this case, any suppression motion would have failed because Petitioner voluntarily

7   gave the shotgun to Mendelson, a private citizen.  People v. Superior Court (Smith), 70 Cal.2d

8   123, 128-130(1969).  While it is true that Officer Sims directed Mendelson not to return the

9   shotgun, in light of Petitioner's threats against the tow yard employees, there is no evidence that

10  Mendelson would have returned the shotgun to Petitioner without the instruction.

11         Additionally, even assuming, arguendo, that Officer Sims' instructions to Mendelson

12  constituted state action, Petitioner lacked standing to assert any Fourth Amendment violation.

13  Only the lawful owner can assert a privacy right, there is no privacy to stolen property and both

14  the car and the shotgun were stolen.  James v. Borg, 24 F.3d 20, 26 (9th Cir. 1994), cert. denied,

15  513 U.S. 935.  CT 256; RT 1084.

16         Moreover, when Petitioner handed the shotgun to Mendelson, as part of a commercial

17  transaction, he had no expectation of privacy.  Minnesota v. Carter, 525 U.S. 83, 88-90 (1988)

18  (noting limited expectation in commercial context).  Because Petitioner did not display any

19  expectation of privacy and because any such expectation would not have been reasonable,

20  Petitioner's rights were not violated.

21         Even assuming  1)  standing, 2) a reasonable expectation of privacy, and 3)  state action,

22  exigent circumstances justified the seizure.  See Bailey v. Newland, 263 F.3d 1022, 1032-33 (9th

23  Cir. 2001).  Because Petitioner had made threats against the tow yard employees, Sims'

24  instructions not to return the weapon was proper.

25         Also, the testimony of Mendelson and Heauser would not have been suppressed as the

26  "fruit of the poisonous tree."  In order to be excluded as "poisonous fruit", evidence must have

27  been obtained by exploitation of that illegality.  People v. Thierry, 64 Cal. App.4th 176, 180

28  (1998).  In this case, Mendelson and Heauser observed Petitioner return to the tow yard with the

gun prior to any seizure.  Accordingly, their testimony was not a result of any illegality.

Finally, even if the failure to bring a suppression motion was ineffective assistance of counsel, Petitioner can show no prejudice because the testimony of Mendelson and Heauser about events prior to any seizure make it unlikely that any reasonable jury would not have found Petitioner guilty.

The state court's denial of this claim was not contrary to, or an unreasonable application of clearly established federal law, or was based on an unreasonable determination of the facts.  See 28 U.S.C. § 2254 (d).  Accordingly, petitioner's claim is DENIED.

2.     Violation of Fourteenth Amendment Due Process by
Discouraging Defense Witness from Testifying (Claim 4)

Petitioner alleges prosecutorial misconduct in that the prosecution improperly discouraged defense witness, Ms. Vescera, from testifying on Petitioner's behalf.  This claim lacks merit.  Petitioner argues that his due process rights were violated when the prosecutor allegedly made repeated threats to discourage potential defense witness Vescera from testifying.  Specifically, he contends that at the Evidence Code section 402 hearing held prior to Ms. Vescera's possible testimony, the prosecutor improperly threatened to prosecute Ms. Vescera on an unrelated charge that had previous been dismissed by the District Attorney's Office and then improperly threatened to charge Vescera with being in possession of stolen property (the shotgun.)  (MPA at 14-15).  Additionally, Petitioner argues that the prosecutor improperly threatened to charge Vescera with perjury if she did not testify in accord with the prosecution's version of the events.  Id. at 15.

Respondent argues that the prosecutor committed no misconduct; he did not threaten to prosecute Vescera for the earlier drug possession charge, the stolen property charge, or the perjury.  Moreover, argues Respondent, even assuming such misconduct occurred, it would not have deprived Petitioner of a fair trial.

a.     Legal Standard

Prosecutorial misconduct is cognizable in federal habeas corpus.  The appropriate standard of review is the narrow one of due process and not the broad exercise of supervisory

1   power.  See Darden v. Wainwright, 477 U.S. 168, 181 (1986).  A defendant's due process rights

2   are violated when a prosecutor's misconduct renders a trial "fundamentally unfair."  See id.;

3   Smith v. Phillips, 455 U.S. 209, 219 (1982) ("the touchstone of due process analysis in cases of

4   alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the

5   prosecutor").

6                   b.       Facts from the State Appellate Record

7           On February 29, 1996, Petitioner's trial counsel indicated that Vescera would be

8   available to testify as a defense witness on the following Tuesday.  RT 977.  The prosecutor

9   advised the court that if Vescera testified about the shotgun, she planned to introduce evidence

10  that the shotgun was stolen.   Accordingly, the prosecutor recommended that Vescera should be

11  advised of her right against self-incrimination outside the jury's presence.  RT 978.  The court

12  agreed to have an appointed attorney present to represent Vescera.  Id.

13          The next day, at the reminder of defense counsel, the prosecutor informed the court that

14  an investigator had interviewed prison inmate Knox Webb, who had indicated that during the

15  weekend between the March 17 traffic stop and the March 20 offenses, he, Vescera and

16  Petitioner had possess and ingested small amounts of  methamphetamine.  The prosecutor

17  asserted that use of  methamphetamine in close proximity to the incident was relevant to

18  Vescera's ability to perceive and recollect the events in question and to Petitioner's knowledge

19  and possession of  methamphetamine.  RT 1083-1084.

20          Trial counsel objected, but the court held that, pursuant to People v. Wheeler, 4 Cal.4th

21  284, 295-300 (1992), prior misconduct by a witness that impacts moral turpitude may be used for

22  impeachment even when the conduct did not result in a criminal conviction.  RT 1086-87.  The

23  court concluded, based on the prosecutor's proffer of Webb's interview, that Vescera knew

24  Webb had pleaded guilty to burglarizing the storage facility from which the shotgun had been

25  stolen and ruled that the prosecutor could attempt to impeach Vescera about how she allegedly

26  come to possess the shotgun.  RT 1086-1090.  The court weighted the probative value against the

27  prejudice under Evidence Code section 352 and concluded that the impeachment "directly relates

28  to the shotgun in questions.  And, omitting it . . . would be misleading the jury as to giving a

false picture of Ms. Vescera.  RT 1086.

The court allowed the prosecutor to impeach Vescera concerning the joint possession of methamphetamine on the weekend of March 18-10, finding that the people were required to prove both possession of methamphetamine and knowledge of its nature and there was a credible basis upon which to ask Vescera if she and Petitioner had possessed and used the drug "hours before" Petitioner's arrest.  RT 1086.  The court also allowed the prosecutor to impeach Vescera with her conduct during the service of the February 6 search warrant, but the prosecutor indicated she would probably only use the prior drug charge if Vescera denied knowledge of the nature of methamphetamine.  RT 1086, 1091.

When defense counsel sought a hearing under Evidence Code Section 402 as to Vescera's prior knowledge that the shotgun was stolen, the prosecutor requested hearing to determine whether Vescera would invoke her right against self-incrimination.  Vescera's counsel suggested that the court grant Vescera immunity for any prior conduct and the prosecutor declined.  RT 1090-91.  In response to the court's request for an offer of proof, Vescera's counsel indicated that she would "directly contradict" the prosecution's evidence that Petitioner returned to the tow yard alone with the shotgun.  Vescera would testify that she had obtained the shotgun and she gave it to Mendelson, albeit in Petitioner's company.  RT 1091.

At this point, the prosecutor requested that the defense turn over to the court an investigative report taken November 30, 1995, in which Vescera had indicated "she did not recall who gave the shotgun" to Mendelson.  RT1091.  Vescera's counsel argued that the prosecutor's refusal to grant immunity could be interpreted as a means to discourage Vescera from testifying.  The prosecutor stressed her concern that, in light of the November statement, the testimony would be false.  RT 1097-98; see also RT 1106-07.  Vescera's counsel again argued that the dismissed methamphetamine charge would be "looming" in the absence of immunity.  The prosecutor expressed her intent not to reference the dismissed charge unless Vescera denied knowing possession of methamphetamine on the weekend in question.  The court ruled that the prosecutor could not examine Vescera regarding the dismissed drug charge unless she obtained prior court approval.  RT 1099.

1    Vescera's counsel conferred with his client and then state that, absent immunity, she

2    would not testify.  Vescera's counsel again asked the prosecutor to reconsider; the prosecutor

3    again declined.  RT 1100.  The court asked the prosecutor why she was opposed to immunity and

4    the prosecutor responded that : 1) this was not an "extraordinary" situation in which immunity

5    should be granted; 2) without all the facts, the she could not be certain of the extend of any grant

6    of immunity; 3) and the prosecutor repeated her fear that Vescera's testimony would be false.

7    RT 1101-02.

8         The court refused to grant immunity, reaffirming that a grant of immunity is "an

9    extremely unusual step for the Court to take, and I don't see any reason to take it here."  RT

10    1006, see also RT 1108.

11                        c.    Analysis

12        Petitioner did not raise this issue until he was in the state appellate courts on habeas

13    corpus.  Exh. G at Petition 17-20; Exh H. at 13-15.  Those courts summarily denied this claim.

14    Exhs. G and H at Orders.

15        There is no evidence in the record that the prosecutor ever indicated or threatened that

16    her office would file charges against Vescera for any of: 1) possession of methamphetamine in

17    February of 1995; 2) possession of methamphetamine during the weekend of March 18-19,

18    1995; or 3) receipt of stolen property, the shotgun and the car.  The prosecutor properly sought

19    evidentiary rulings form the trial judge outside the presence of the jury.  The court determined

20    that the impeachment was proper, except as to the dismissed drug charge.

21        "A state court's evidentiary ruling is grounds for federal habeas corpus relief only if it

22    renders the state proceeding so fundamentally unfair as to violate due process."  Bueno v.

23    Hallahan, 988 F.2d 86, 87 (9th Cir. 1993).  The definition of "fundamental fairness" is a narrow

24    one. "We have stated many times that 'federal habeas corpus relief does not lie for errors of state

25    law.'  Today, we reemphasize that it is not the province of a federal habeas court to reexamine

26    state-court determinations on state-law questions.  In conducting habeas review, a federal court

27    is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the

28    United States."  Estelle v. McGuire, 502 U.S. 62, 67-68 (1992)(citations omitted).

1    The court allowed the prosecutor to use proper impeachment material and declined to
2  offer blanket immunity.  Under section 1324, only the prosecutor may seek immunity and
3  immunity may not be granted against perjury in giving the testimony.  Accordingly, the decision
4  of the court to deny immunity was correct.  Moreover, even if the ruling had been incorrect, it
5  would not have amounted to denial of Petitioner's right to a fair trial.  Even if Vescera had
6  testified, her testimony would have been impeached by her contradictory previous statement to
7  the defense investigator and further impeached by the bias of her relationship with Petitioner.
8  Moreover, even if Vescera's testimony was received and believed, it would still have subjected
9  Petitioner to a finding of guilt based on the theory that Petitioner constructively possessed the
10  shotgun.  Petitioner asked Mendelson if he could use the shotgun which he claimed belonged to
11  his brother to retrieve what he claimed was his car.  In these circumstances, even if the jury
12  believed that Vescera handed the shotgun to Mendelson, the jury would still have found that
13  Petitioner constructively possessed the shotgun.

14    For all of the above reasons, Petitioner's claims of prosecutorial misconduct are
15  DENIED.  The state court's rejection of these claims was not an objectively unreasonable
16  application of, nor contrary to, existing Supreme Court precedent.  28 U.S.C. § 2254(d).

17
                    3.    Ineffective Assistance of Counsel for Failing to Raise 14th Amendment
18                         Claim (Claim 5)

19    As discussed above, the claim of prosecutorial misconduct violating Petitioner's due
20  process rights is without merit.  Because this claim lacks merit, it cannot be said that Petitioner's
21  trial counsel was deficient in failing to raise it.  The state court's rejection of this claim was
22  not an objectively unreasonable application of Supreme Court precedent.  See 28 U.S.C. §
23  2254(d).  Petitioner's claim has no merit and is DENIED.

24
                    4.    Violation of Due process and Confrontation Rights by
25                         Restrictions on Impeachment of Prosecution Witnesses (Claim 6)

26    Petitioner raises as a claim of his due process and confrontation rights two rulings by the
27  trial court restricting his right to impeach prosecution witnesses Mendelson and Heauser.  Petn.
28  at 6; Add. to Petn. at Ground Four, MPA at 16-19.  Petitioner asserts two grounds.  The first is

1  that he was denied the opportunity to impeach Mendelson and Heauser by claiming they had

2  removed items from the car while it was stored and, therefore, improperly resisted returning the

3  car to Petitioner.  The court held that if Petitioner wanted to impeach the witnesses by claiming

4  an ulterior motive for wanting to hold onto the vehicle, then the prosecution would be able to

5  introduce evidence that Mendelson suspected that the car was stolen.  RT 93.  The Court further

6  refused to allow Petitioner to ask about items removed from the car unless he had witnesses to

7  establish a factual basis for the question.  RT 94.  The trial court's requirement of an evidentiary

8  basis for questions does not constitute error, no less the type of error that renders a trial

9  fundamentally unfair as to raise  a constitutional violation.  See Carriger v. Lewis, 971 F.2d 329,

10  332-33 (9th Cir. 1992), cert. den. 507 U.S. 992 (1993)("The defendant's right to present evidence

11  is not absolute; he must comply with established rules of evidence and procedure.").[4]

12      The second basis is that Petitioner was precluded from introducing a statement by tow

13  yard owner Cotton that had indicated when he first heard about the shotgun and the Mack 10 that

14  perhaps Heauser and Mendelson "were exaggerating" and "when they were tired, sometimes he

15  thought they forgot things and may have exaggerated."  RT 722.  Prior to Cotton's testimony, the

16  prosecutor objected to the use of this statement, claiming that it was not permissible under the

17  Evidence Code.  Evidence Code section 786 provides: "Evidence of traits of his character other

18  than honesty or veracity, or their opposites, is inadmissible to attack or support the credibility of

19  a witness."  Cal. Evid. Code § 786.  The prosecutor argued that exaggerating or forgetting was

20  not the same as "honesty or veracity."  Additionally, Evidence Code Section787 provides:

21  "evidence of specific instances of his conduct relevant only as tending to prove a trait of his

22  character is inadmissible to attack or support the credibility of a witness."  The prosecutor

23  argued that use of the statement would be improper character evidence under section 787.

24      The trial judge requested briefing on the issue.  The issue was again raised at the close of

25  Cotton's testimony.  The defense motion did not supply any authority for allowing the testimony.

26

27      [4]It is unclear whether defense counsel lacked an evidentiary basis for her allegations or
    whether she chose not to introduce evidence as to stolen items because it would open the door
28  for the prosecution to introduce evidence that the car was stolen.   In either case, there is no
    constitutional violation.

ORDER, *page 16*

1  CT 328-329; see RT 1052.  Instead, the motion merely argued without citation that

2  "unreliability" and a "tendency to exaggerate" were synonymous  with "honesty."   The court

3  found that the proffered statement did not come within "what is permitted by the Evidence Code,

4  that is evidence of traits of character for honesty or veracity or their opposites." RT 1053.  The

5  prosecutor then tried to augment the record with a statement that Cotton felt that Mendelson and

6  Heauser were honest and that he would hire them back in a minute.  With that additional

7  information, the court also excluded the testimony under Evidence Code Section 352, finding it

8  more prejudicial than probative.  RT 1054.

9         The court's conclusion that a statement that witnesses may have been exaggerating was

10  not equivalent to a statement about their character trait of honesty was within its broad discretion

11  to limit cross-examination of witnesses.  Similarly, the Court's finding that introduction of the

12  conflicting statements would be more prejudicial than probative was well within the trial court's

13  discretion.  Moreover, even if the trial court erred in excluding Cotton's statement, such error

14  would not have been fundamentally unfair.  If the statement about exaggeration had been

15  admitted, the prosecutor would have been able to use Cotton's later statement affirming the

16  honesty of the witnesses.  Accordingly, any negative impact on Petitioner's defense would have

17  been minimal and does not rise to the level of a constitutional violation.

18         For all of the above reasons, Petitioner's claims of prosecutorial misconduct are

19  DENIED.  The state court's rejection of these claims was not an objectively unreasonable

20  application of, nor contrary to, existing Supreme Court precedent.  28 U.S.C. § 2254(d).

21

                        5.     Ineffective Assistance of Counsel for Failing to Raise
22                             Violation of Due process and Confrontation Rights (Claim 7)

23         As discussed above, the claim that the trial court violating Petitioner's due process and

24  confrontation rights by limiting impeachment of the tow yard employees is without merit.

25  Because this claim lacks merit, it cannot be said that Petitioner's trial counsel was deficient in

26  failing to raise it.  The state court's rejection of this claim was not an objectively unreasonable

27  application of Supreme Court precedent.  See 28 U.S.C. § 2254(d).  Petitioner's claim has no

28  merit and is DENIED

1
2
        6.      Insufficient Evidence to Support Conviction for
                Possession of Methamphetamine (Claim 8)

3       Petitioner claims that there was insufficient admissible evidence to support he conclusion

4   that he had possessed a "usable amount" of methamphetamine.  Add. to Pet. at Ground Five.  As

5   part of this claim, Petitioner asserts that the court erred in denying his motion for mistrial based

6   on 1)  inadmissible evidence of the Valtox test performed by Sergeant Augustus, entered by the

7   prosecution witnesses and relied upon by treating physician Peckler and consulting physician

8   Lennon; and 2) the "intentional tainting" of the drug evidence by Sergeant Augustus during the

9   collection process.[5]  MPA at  19, 22-23, 25.

10                  a.      The Denial of the Mistrial Motion was Proper

11      The trial court ruled that the results of the Valtox test were inadmissible and prosecution

12  witnesses were instructed not to tell the jury the results of the Valtox test.  Opinion at 7-8.  The

13  court, however, allowed  the prosecutor to present evidence that "a test was made, and that is

14  why there is nothing left to submit to the jury."  RT 87-88; see Opinion at 8.  Dr. Peckler was

15  asked what information he had been given that he used to treat the Petitioner.  Dr. Peckler

16  testified that "I was told that he had a baggie that was in his rectum that had popped, and that the

17  baggie came out, and I was told that the powder was tested."  RT 811-812.  Based on this

18  testimony, Petitioner moved for a mistrial at the end of the day.  The prosecutor opposed the

19  mistrial because: 1) both doctors testified their diagnoses were methamphetamine overdose; 2)

20  Petitioner admitted to Dr. Lennon that he was a methamphetamine user; and 3) the substance had

21  been tested by a state criminalist.  RT 971.  The court denied the motion for a mistrial.

22      The appellate court found no error in this ruling based upon state law that a motion for

23  mistrial "is addressed to the sound discretion of the trial court.  Further a motion for mistrial

24  based upon improper admission of evidence presupposes that the effect of that evidence is so

25  prejudicial as to be incurable by striking it or admonishing the jury to disregard it."  Opinion at 9,

26  citing People v. Eckstrom, 187 Cal.App.3d 323, 330 (1986).

27
28      [5]The "intentional tainting" claim is discussed in the next section.

1    This ruling was not in error and is not contrary to, nor involves an unreasonable

2  application of, clearly established federal law.  First, the prosecution was allowed to admit

3  evidence that a test had been done.  Second, any prejudice was cured by Petitioner's requested

4  admonition that certain evidence had been presented only for limited purposes and that

5  "Testimony was presented to you to the effect: that medical providers were informed that the

6  substance taken from defendant was suspected to be methamphetamine.  This testimony was

7  presented for the sole purpose of explaining the actions of the medical providers and not as proof

8  that the substance taken from the defendant was, in fact, methamphetamine." Opinion at 9; see

9  also RT 1115-16.

10                    b.      Substantial Evidence of a Usable Amount was Admitted

11     The elements of unlawful possession of a controlled substances are:

12  are :

13

14         "dominion and control of the substance in a quantity usable for consumption or
           sale, with knowledge of its presence and of its restricted dangerous drug
15         character. Each of these elements may be established circumstantially.  It has
           been observed that the statute proscribing the unlawful possession of controlled
16         substances 'makes possession illegal without regard to the specific intent in
           possessing the substance.' Although the possessor's knowledge of the presence of
17         the controlled substance and its nature as a restricted dangerous drug must be
           shown, no further showing of a subjective mental state is required.

18  People v. Martin, 25 Cal.4th 1180, 1184-85 (2001)(citations omitted.)  The prosecutor need not

19  present direct evidence that the defendant possessed a usable amount of the controlled substance

20  upon arrest.  As one court explained:

21         If the evidence showed that the defendant was in possession of an illegal drug
           which he destroyed by flushing it down the toilet, it is clear that defendant
22         nonetheless could be convicted of illegal possession based on evidence (whether
           direct or circumstantial) that the substance was in his possession immediately
23         before he was arrested. [citations]

24         Similarly, loss or destruction of evidence by ingestion should not defeat a
           possession charge.
25
           In short, we see no reason why a drug possession charge could not be based on
26         direct or circumstantial evidence of past possession. As the concurring justice in
           Sullivan observed, the narcotics possession statutes do not require proof of
27         possession at the very time of arrest
                                                    ***
28         If, as in the present case, direct or circumstantial evidence establishes that the

ORDER, *page 19*

1  defendant possessed an illegal drug during the period of the applicable statute of
   limitations, no compelling reason appears why that evidence should not be
2  sufficient to sustain a possession conviction. Certainly, the drug possession
   statutes contain no such requirement. The additional, fortuitous fact that the
3  defendant has consumed or ingested the drug likewise should not preclude a
   finding of his prior unlawful possession of it.
4

5  People v. Palaschak, 9 Cal.4th 1236, 1241-43 (1995)[6].

6       Even though the prosecutor was not required to establish that Petitioner possessed a

7  usable amount of methamphetamine when the substance was seized, the prosecution did present

8  Sergeant Augustus' expert opinion that the amount collected was a usable amount.  RT 951[7]  An

9  expert police officer's opinion as to the usable amount is sufficient for the jury to find a usable

10 amount, even in the absence of any qualitative testing.  People v. Reyes, 273 Cal. App.2d 769,

11 773 (1969), cert. den., 396 U.S. 1024 (1970).

12      In addition, the criminalist testified that Petitioner's symptoms were consistent with

13 Petitioner's possession of a usable amount of methamphetamine.  RT 1007-1008.  Similarly, Dr.

14 Pecker and Dr. Lennon testified that Petitioner's symptoms were consistent with ingestion of a

15 usable amount of methamphetamine.

16      Accordingly, the state appellate court's determination that sufficient evidence exited to

17 support he judgment is not contrary to or an unreasonable application of clearly established

18 United States Supreme Court precedent.  28 U.S.C. § 2254(d)(1).

19            7.    Ineffective Assistance of Trial Counsel (Claim 9)

20      Petitioner contends that trial counsel was incompetent for "not moving to suppress the

21 evidence relating to the methamphetamine."  Doc. #6 at 2-3 (claim 9).[8]  Petitioner appears to

22 have tried to raise this issue in his first trial court habeas petition. Exh. E, Petn. at 17-27.   As

23 discussed above, the trial court denied the petition, finding the allegations "unspecific and

24

25      [6]This case was filed May 8,1995, nine months prior to Petitioner's trial.

26      [7] Sergeant August had served for three years a narcotics office with Marin County narcotics
   and major crimes task force.  RT 919.  During that time he had been involved in several hundred
27 investigations involving methamphetamine.  RT 920.  Additionally, he had previously qualified
   in Superior Court as an expert on methamphetamine. RT 922.
28
        [8]The Respondent incorrectly identified this as claim 10.

1   conclusory" and "devoid of any basis in fact." Exh. E, Order at 1.  Petitioner raised this issue in

2   his second Superior Court habeas petition.  Exh. F4 at 5-7.  The state court found that a motion

3   to suppress would not have been successful.  Exh. F at Order at 2.   In the state appellate courts,

4   Petitioner recast his argument to claim that trial counsel was ineffective in failing to file a motion

5   to suppress the methamphetamine evidence based on a due process violation arising from law

6   enforcement's intentional destruction of potentially favorable evidence. Exh. G at 26; Exh H at

7   17.

8                           a.      Trial Court Record of Facts

9          Trial counsel was aware that Augustus had commingled the samples from the corner of

10  the safety cell, where Petitioner had been positioned prior to squatting over the waste hole, with

11  the substance he obtained from Petitioner's chest hair.  Trial counsel cross-examined Augustus

12  on this issue.  RT952-955.  Augustus admitted that he had commingled the substances and that it

13  was "normally" not a good idea to mix substances.  RT 953.  Augustus described how the

14  substances remained separate, even though they were in the same paper "bindle" (made from the

15  non-sticky part of a post-it note)  and that he tested a part of each substance.  RT 944-45, 955-56.

16  Augustus also testified that he found the plastic baggie, but that "[w]ith everybody's safety

17  involved . . . I thought it would be best to throw it away."  RT 942.   Augustus also testified that,

18  in his experience, the Department of Justice does not appreciate items being sent for testing that

19  have been where this baggie had been.  RT 943.

20                          b.      Analysis

21         The California Supreme Court has held that the duty of the state to preserve evidence is

22  assessed under United State Supreme Court holdings.  The duty to preserve evidence is limited

23  to that which "might be expected to play a significant role in the suspect's defense."  In order to

24  meet this standard: "the evidence must both possess an exculpatory value that was apparent

25  before the evidence was destroyed, and be of such a nature that the defendant would be unable to

26  obtain comparable evidence by other reasonably available means."  People v. Zapien, 4 Cal.4th

27  929, 964 (1993), quoting California v. Trombetta, 467 U.S. 479, 488-489 (1984).  Additionally,

28  "unless a criminal defendant can show bad faith on the part of the police, failure to preserve

1   potentially useful evidence does not constitute a denial of due process of law." Id., quoting

2   Arizona v. Youngblood, 488 U.S. 51, 58 (1988).

3          Under these standards, Petitioner cannot show any failure to preserve evidence that

4   amounts to a constitutional violation.  At the time Augustus combined the samples, there is no

5   evidence that the different samples had independent significance that was apparent to Augustus

6   at the time.  Augustus had observed Petitioner in the corner (where he collected the sample from

7   the floor) before Petitioner had "scooted" over to the waste hole and attempted to dispose of the

8   broken baggie.  While Augustus' commingling of the substances may have violated departmental

9   policy and may not have been a good idea, there is no evidence that combining the substances

10  was destroying evidence that possessed an apparent exculpatory value at the time.  Accordingly,

11  there is no evidence that Augustus combined the samples in bad faith.  Similarly, there is no

12  evidence that would have invested the baggie with apparent exculpatory significance at the time

13  Augustus threw it away.

14         Because there was no destruction of then significant evidence and no bad faith, any

15  suppression motion would have been without merit.  Accordingly, the state appellate court's

16  rejection of an ineffective assistance of counsel claim based on the failure to make a motion to

17  suppress the methamphetamine evidence was not an unreasonable application of federal law.

18              8.    54 Year Sentence Is Cruel and Unusual Punishment (Claim 11)

19         Petitioner claims that his indeterminate term of fifty-four-years-to-life constitutes cruel

20  and unusual punishment. Pet at App. (Ground six); MPA at 40.   Petitioner received a sentence

21  of seventy-five years-to-life based on his four prior "strikes" and four "prior prison" terms and

22  twelve prior felony convictions.

23                        a.    Applicable Law

24         A criminal sentence that is not proportionate to the crime for which the defendant was

25  convicted violates the Eighth Amendment.  See Solem v. Helm, 463 U.S. 277, 290 (1983)

26  (sentence of life imprisonment without possibility of parole for seventh nonviolent felony

27  violates the Eighth Amendment).  But "outside the context of capital punishment, successful

28  challenges to the proportionality of particular sentences will be exceedingly rare."  Id. at 289-90.

1    The Eighth Amendment does not require strict proportionality between crime and sentence.

2    Rather, "it only forbids extreme sentences that are 'grossly disproportionate' to the crime."

3    Ewing v. California, 538 U.S. 11, 23 (2003) (quoting Harmelin v. Michigan, 501 U.S. 957, 1001

4    (1991)).

5        In determining whether the sentence is grossly disproportionate under a recidivist

6    sentencing statute, the court looks to whether an "extreme sentence is justified by the gravity of

7    [an individual's] most recent offense and criminal history."  Ramirez v. Castro, 365 F.3d 755,

8    768 (9th Cir. 2004).  Under this proportionality principle, the threshold determination for the

9    court is whether petitioner's sentence is one of the rare cases in which a comparison of the crime

10   committed and the sentence imposed leads to an inference of gross disproportionality.  United

11   States v. Bland, 961 F.2d 123, 129 (9th Cir. 1992) (quoting Harmelin, 501 U.S. at 1005), cert.

12   denied, 506 U.S. 858 (1992); accord Ewing, 538 U.S. at 29-30 (applying Harmelin standard).

13   Only if such an inference arises does the court proceed to compare petitioner's sentence with

14   sentences in the same and other jurisdictions.  Harmelin, 501 U.S. at 1004-05.  Not surprisingly,

15   the threshold for an "inference of gross disproportionality" is quite high.  See, e.g., Ewing

16   (holding that a sentence of twenty-five years to life for conviction of grand theft with prior

17   convictions was not grossly disproportionate); Harmelin, 501 U.S. at 1005 (holding that a

18   mandatory sentence of life without possibility of parole for first offense of possession of 672

19   grams of cocaine did not raise inference of gross disproportionality).

20                 b.    Facts of Instant Offense

21        Under California law, possession of a firearm by a felon is a felony which is punishable

22   by a term of imprisonment of sixteen months, two, or three years. §§ 12021, 18.[9]

23         As a matter of public policy, the Legislature has made it a crime for convicted
            felons to possess firearms.  The purpose of this law is to protect public welfare by

24         precluding the possession of guns by those who are more likely to use them for
            improper purposes.  Due to the potential for death or great bodily injury from the

25         improper use of firearms, public policy generally abhors even momentary
            possession of guns by convicted felons who, the Legislature has found, are more

26

27        [9]Prior to 1989, this offense was a "wobbler" an offense that could be charged as either a
   misdemeanor or a felony.  In 1989 the statue was amended and the option of charging the

28   offense as a misdemeanor was removed.  1989 Cal. Stats., Ch 1044 § 3.

1   likely to misuse them.

2   People v. Pepper, 41 Cal.App.4th 1029 1037, 38 (1996) (citations omitted.)

3        Possession of methamphetamine is a "wobbler" and can be prosecuted as either a felony

4   or a misdemeanor. § 11377(a).  However, the offense is considered a felony until "expressly

5   declared otherwise by a trial court."  People v. Wood, 62 Cal. App.4th 1262, 1268 (1998); see

6   also § 17.

7        The facts surrounding these offenses reveal the seriousness of their nature.  Petitioner had

8   been released from parole, after again spending 30 days in a parolee "detoxification" program,

9   within weeks of his arrest for these offenses.  RT 1210-1211.  Petitioner was not in compliance

10  with any of the conditions of his parole.  On February 25, 1995, Petitioner's parole office made a

11  routine call on Petitioner and he appeared to be under the use of a stimulant.  Petitioner admitted

12  to his parole officer that he had used methamphetamine prior to the parole officer's arrival,

13  Petitioner was directed to report to the office on February 27, 1995, but he did not comply.

14  Parole Officer's [violation] report to board of prison terms (CDC 1676) App. 2 to Exh. G at 1.

15  Petitioner's presence in Marin County on March 17, 1995 was another violation of the terms of

16  his parole.  Id. at 2.  Petitioner then attempted to identify himself as the car's owner and was in a

17  stolen car.  CT 253.

18       On March 20, 1995, Petitioner attempted to use a shotgun, which had been stolen, as

19  collateral to gain release of the stolen car.  Petitioner made threats of using other guns against the

20  tow yard employees and/or the CHP office.  CT 51, 83-85;  RT 534, 765.  Upon his arrest

21  Petitioner carried controlled substances into the county jail.

22              c.      Petitioner's Recidivist History

23       Petitioner's history of recidivism is too lengthy to include all the details.

24       In 1977, Petitioner was involved in a strong-arm robbery against a 70 year-old woman for

25  which he received an indeterminate term of two years to life.  CT 437; RT 1195; 1232-34.  This

26  was Petitioner's first "strike" and first "prison prior."  Petitioner was incarcerated until paroled

27  in April of 1978; he was reincarcerated for violating his parole ("violated") in July; paroled in

28  December; violated again 8 days later.  RT 1196-977.  Plaintiff was released in April of 1979.

In October of 1980, Petitioner was received by CDC on a judgment for first degree burglary; forcible rape, forced oral copulation and auto theft against the same victim.  RT 1198-1202; CT 414-20.  Petitioner was also charged with escape with force and assault on a police officer for striking a bailiff in the head several times while trying to escape during the rape trial. RT 1242, CT 348.  Both forcible rape and forcible oral copulation are "serious" and "violent" felonies. §§667(a)(4), 667.5(c)(3) & (5); 1192.7(c)(3) & (5).  This was Petitioner's second strike and prison prior.

In December of 1987, Petitioner began serving a four year term arising out of a felony false imprisonment, where the false imprisonment is accomplished by violence, menace, fraud, or deceit. §§ 236, 237.  This was his third prison prior.  He was released on parole in October of 1989. RT 1205.  In December of 1989, Petitioner was arrested.  RT 1205-06.  Petitioner was released to the custody of the Santa Clara County on his June 4, 1990 release date.  RT 1206. On June 27, 1990, Petitioner was convicted of  possession of controlled substance, Health & Saf. Code §11377(a), and possession of marijuana for sale; Id. at§ 11359.  CT 204.   In August of 1990, Petitioner was returned to the CDC following an arrest for driving under the influence.  RT 1206.  He was released in April of 1991 and arrested in May for unlawful taking of a motor vehicle and receiving stolen property.  RT 1206.   In June of 1991, Petitioner  was convicted of driving while under the influence and sentenced to 180 days and remained in Jail until December of 1991.  RT 1206-07.

Petitioner returned to CDC custody in March of 1992 following an arrest.  RT 1207. Petitioner was released in July of 1992, but returned following an August 19, 1992 arrest.  RT 1207.  In September of 1992, Petitioner began serving a two-year-and eight-month commitment (his fourth prison prior) for felony drunk driving. Veh. Code §§23152 and possession of controlled substance, Health & Saf. Code §11377(a).  RT 1207.  Petitioner was released on parole in January, 1994; reincarcerated in February and placed in the substance abuse treatment center; released in March, returned in April for parole violations; released in July and returned in August, again for parole violations.  RT 1208-1212.  In November of 1994, Petitioner was released, but he was arrested and placed again in detoxification in January of 1995 and released

again in February of 1995.  Petitioner was arrested for the instant offenses in March of 1995.  Id.

All told, the Superior Court in the underlying action sustained four prior "strike" four "prison prior" and twelve prior felony conviction allegations.  In March of 1995, Petitioner's probation officer described Petitioner's status as "continues to demonstrate his unwillingness to comply with his conditions of parole."  He stated that the current arrest "clearly demonstrates the danger he presents to society"  RT 458.

Petitioner asked the trial judge to reduce the possession of methamphetamine count to a misdemeanor and to strike the prior prison allegations.  The court denied the request, stating: "You have a terrible record of violent crime: Robbery, rape, residential burglary.  You have been in prison for the most part, since 1977, and have been unable to remain free without violating your parole, or committing new crimes for at most weeks at a time.[¶] Your history of violence, the threats that you made in this case, clearly indicate that you're a danger to society."  RT 1293-94.

Petitioner had a long history of violence, endangering the public, and inability to abide by the law.  Petitioner had been incarcerated for burglary, indecent exposure, robbery (that injured a 70 year old woman), forcible rape, felony false imprisonment, and felony drunk driving.

Similar or longer sentences than petitioner's for similar or less serious crimes than those of which petitioner was convicted have been held to not be "grossly disproportionate" under the Eighth Amendment.  See, e.g., Ewing v. California, 538 U.S.11, 24-28 (2003) (sentence of 25 years to life for conviction of grand theft with prior convictions was not grossly disproportionate); Harmelin, 501 U.S. at 1005 (mandatory sentence of life without possibility of parole for first offense of possession of 672 grams of cocaine did not raise inference of gross disproportionality); Rummel v. Estelle, 445 U.S. 263, 284-85 (1980) (upholding life sentence with possibility of parole for recidivist convicted of fraudulent use of credit card for $80, passing forged check for $28.36 and obtaining $120.75 under false pretenses); Taylor v. Lewis, 460 F.3d 1093, 1101-02 (9th Cir. 2006) (upholding sentence of twenty-five years-to-life for possession of .036 grams of cocaine base where petitioner served multiple prior prison terms and his prior offenses involved violence and crimes against a person); Alford v. Rolfs, 867 F.2d 1216, 1221-

1  23 (9th Cir. 1989) (upholding life sentence with possibility of parole for possession of stolen

2  property worth $17,000 and having three prior non-violent convictions, including possession of a

3  controlled substance and forgery).  In light of this authority, petitioner's sentence does not

4  violate the Eighth Amendment's prohibition against cruel and unusual punishment so as to

5  warrant habeas relief.  Accordingly, petitioner's claim is DENIED.

6

7            9.     Enhancement Based on 1977 Conviction Pursuant to Plea
                    Violated Plea Agreement (Claim 12)

8        Petitioner's 1977 robbery conviction was premised upon a negotiated plea.  Petitioner

9  claims that the prosecutor's use of this plea as a strike in the sentencing for the instant offenses

10 violated the plea agreement.  Petn at App, Ground Six; MPA at 46.  Petitioner further claims that

11 if he had known the plea could be used later to impose a three strike sentence he would have

12 invoked his right to a jury trial in the 1977 case and possibly might have been acquitted.  MPA

13 47.

14       Petitioner does not argue that the 1977 plea bargain expressly prohibited the use of the

15 conviction for enhancement purposes.  Petitioner argues instead that he should have been

16 advised of this possible consequence and, if he had been so advised that he would not have

17 entered the guilty plea.  In 1977, however, the trial court had no way to know that the Three

18 Strikes law would be passed more than fifteen years later.  Indeed, in order for a plea to be

19 "knowing and voluntary" a court need only advise a defendant of the direct consequences of a

20 plea and need not advise of collateral or indirect consequences.  People v. Kunkel, 176 Cal.

21 App.3d 46, 52-52 (1985); see also Torry v. Estelle, 842 F.2d 234, 236 (9th Cir. 1988) (holding

22 that a consequence is direct if it has a "a definite, immediate and largely automatic effect on the

23 range of the defendant's punishment.") (citation omitted.)  Additionally, under California law,

24 Petitioner can properly be enhanced by a serious/violent felony conviction that occurred prior to

25 the enactment of the Three Strikes Law.  People v. O'Roark, 63 Cal.App.4th 872, 876-77 (1998).

26       Moreover, even assuming the use of the 1977 agreement was improper, Petitioner has not

27 been prejudiced because the trial court found he had suffered four prior strikes.  RT 1270-1272.

28 Thus, even without the 1977 plea strike, Petitioner was already a "three-striker," having been

1  convicted in Humboldt County of the serious felony of residential burglary and the

2  serious/violent felonies of forcible oral copulation and rape.  See RT 1270-1271.

3       Accordingly, Petitioner has failed to establish that the state denials of this claim were an

4  unreasonable interpretation of Federal Constitutional law or an unreasonable application of that

5  law to this claim.

6            10.    Ineffective Assistance of Appellate Counsel (Claim 13)

7       Petitioner asserts that his state appellate counsel was ineffective for failing to argue

8  multiple meritorious issues.  App to Petn at Ground Seven; MPA at 49.  Specifically Petitioner

9  contends that appellate counsel was ineffective by failing to argue: 1) Trial counsel was

10 incompetent (Claims 3,5,7 and 9); 2) Mendelson's retention of the shotgun was an illegal seizure

11 (the basis for claim 3); 3) the prosecutor committed misconduct (claim 4); 4) the trial court erred

12 by failing to allow Petitioner to impeach the tow yard witnesses (claim 6); 5) the

13 methamphetamine should have been suppressed (the basis for claim 9); and 6) Constitutional

14 violations from the term of 54 years to life under the Three Strikes Law (claims 11 and 12).

15 MPA 50-51.[10]

16            a.     Legal Standard

17      The Due Process Clause of the Fourteenth Amendment guarantees a criminal defendant

18 the effective assistance of counsel on his first appeal as of right.  Evitts v. Lucey, 469 U.S. 387,

19 391-405 (1985).[11]  Claims of ineffective assistance of appellate counsel are reviewed according

20 to the standard set out in Strickland v. Washington, 466 U.S. 668 (1984);  Miller v. Keeney, 882

21 F.2d 1428, 1433 (9th Cir. 1989).  A defendant must show that counsel's advice fell below an

22 objective standard of reasonableness and that there is a reasonable probability that, but for

23 counsel's unprofessional errors, he would have prevailed on appeal.  Miller, 882 F.2d at 1434 &

24

25      [10]The references to the claims already discussed was not in the MPA.

26      [11]Although the right to the effective assistance of counsel at trial is guaranteed to state
    criminal defendants by the Sixth Amendment as applied to the states through the Fourteenth,
27  Lucey, 469 U.S. at 392, the Sixth Amendment does not address a defendant's rights on appeal;
    the right to effective state appellate counsel is derived purely from the Fourteenth Amendment's
28  due process guarantee.  Id.

1   n.9 (citing to <u>Strickland</u>, 466 U.S. at 688, 694; <u>United States v. Birtle</u>, 792 F.2d 846, 849 (9th

2   Cir. 1986)).

3        Appellate counsel does not have a constitutional duty to raise every nonfrivolous issue

4   requested by defendant.  <u>Jones v. Barnes</u>, 463 U.S. 745, 751-54 (1983).  The weeding out of

5   weaker issues is widely recognized as one of the hallmarks of effective appellate advocacy.

6   <u>Miller</u>, 882 F.2d at 1434 (footnote and citations omitted).  Appellate counsel therefore will

7   frequently remain above an objective standard of competence and have caused his client no

8   prejudice for the same reason--because he declined to raise a weak issue.  <u>Id</u>.

9                          b.      Analysis

10       As discussed above in sections IIB1, 3, 5 and 7, trial counsel was not incompetent for

11   failing to raise the alleged errors Petitioner now assigns to appellate counsel.  Accordingly,

12   appellate counsel cannot now be faulted for failing to raise those issues in the Court of Appeal.

13   <u>Featherstone v. Estelle</u>, 948 F.2d 1497, 1507 (9th Cir. 1991).

14       Additionally, because trial counsel did not bring the motions to suppress/dismiss,  the

15   substantive issues underlying the claims of ineffective assistance of counsel could not have been

16   raised on direct appeal.  <u>People v. Williams</u>, 20 Cal.4th 119, 128, 135 (1999).  Accordingly,

17   appellate counsel was not ineffective for failing to raise the substantive issues.  Similarly,

18   because trial counsel did not object to the alleged misconduct of the prosecutor in improperly

19   dissuading Vescera from testifying, appellate counsel could not raise this issue on appeal.

20   Moreover, for the reasons discussed above in section IIB2, the claim that the prosecutor engaged

21   in misconduct is without merit.

22       For the reasons discussed above in section IIB4, the denial of impeachment of

23   prosecution witnesses was proper; any such claim would have been rejected on appeal; and

24   appellate counsel was not ineffective for failing to raise the issue.

25       Finally, as discussed above in section IIB8 and 9, the Three Strikes enhanced sentence

26   did not violate the 8th Amendments proscription on cruel and unusual punishment.  Additionally,

27   as this court recognized in dismissing the ex post facto claim, the Three Strikes law does not

28   violate the ex post facto prohibitions of the constitution. Doc. #6 at 3 (finding the claim "patently

without merit.").    Accordingly, appellate counsel cannot have been ineffective for failing to raise the issue.

For all of the above reasons, the court finds that petitioner has not made a showing of deficient performance by appellate counsel under the <u>Strickland</u> standard.

**III.    CONCLUSION**

For the foregoing reasons, the petition for a writ of habeas corpus is DENIED.

DATED:    ___September 21, 2007___                    _____
                                                                               JAMES WARE
                                                                               United States District Judge

copies mailed on   9/25/2007     to:

Plaintiff (pro se)
Arthur C. Mefford
C-22481
CSP-Solano II
California State Prison-Solano
P.O. Box 4000
Vacaville, CA 95696

_____
Courtroom Deputy